1  **BUCKLEYSANDLER LLP**
2  RICHARD E. GOTTLIEB (State Bar No. 289370)
   rgottlieb@buckleysandler.com
3  FREDRICK S. LEVIN (State Bar No. 187603)
   flevin@buckleysandler.com
4  100 Wilshire Boulevard, Suite 1000
   Santa Monica, CA 90401
5  Phone: (310) 424-3900
   Facsimile: (310) 424-3960
6
   Attorneys for Plaintiff Desside Holdings Limited
7
8           **UNITED STATES DISTRICT COURT**
9     **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**
10
11 DESSIDE HOLDINGS LIMITED,          Case No. CV14-2483 FMO R2X
12           Plaintiff,
13 vs.                                **COMPLAINT FOR BREACH OF**
                                      **CONTRACT, RESTITUTION,**
14 MEGAWINE, INC., BORIS SHATS,       **TORTIOUS INTERFERENCE**
   and ARTEM ZASTOUPAILO              **WITH CONTRACTUAL**
15                                    **RELATIONS, AND FRAUDULENT**
           Defendants.                **TRANSFERS**
16
                                      [Related to *Desside Holdings Limited v.*
17                                    *Megawine, Inc. et al.*, United States
                                      District Court Case No. 13-CV-8211
18                                    Hon. John A. Kronstadt
                                      Hon. Jay C. Gandhi]
19
20
21
22
23
24
25
26
27
28

                    **COMPLAINT**

BUCKLEY SANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

Plaintiff Desside Holdings Limited ("Desside"), by its attorneys, brings this action against Megawine, Inc. ("Megawine"), Boris Shats ("Shats"), and Artem Zastoupailo ("Zastoupailo") and alleges as follows:

## INTRODUCTION

1.     Defendant Megawine is part of a single fraudulent enterprise with Russian Joint Stock Company Mozel ("Mozel"), operated by their joint owner and officer, Vadim Tomchin ("Tomchin"), to defraud Desside Holdings Limited ("Desside") of funds it loaned Mozel.  Discovery authorized by this Court in a related proceeding establishes the existence of the scheme and Megawine's active participation in it.   It is well established under California law that when two purportedly separate corporations are controlled and managed by the same individual to operate as a single enterprise to commit fraud, their corporate separateness will be disregarded.  On January 23, 2014 the Arbitration Court of St. Petersburg and the Leningrad Region entered judgment in Desside's favor and against Mozel for breach of the loan agreements at issue here.   The validity of Desside's claim has thus already been established.  As established here, Megawine is also jointly and severally liable as Mozel's alter ego and the recipient of millions of dollars of Desside's money.

2.     Plaintiff Desside brings this breach of contract action against Megawine, the alter ego of Mozel, a borrower indebted to Desside for approximately $30 million pursuant to certain loan agreements.  At all relevant times, Megawine existed for the benefit of Mozel, both entities were owned and controlled by Vadim Tomchin and his family, and the companies commingled funds, including the deposit of funds borrowed from Desside directly into Megawine's accounts. Mozel is in default under the loan agreements and Megawine has obstructed Desside's collection efforts.   Therefore, an inequitable result would ensue if Megawine's corporate separateness is maintained.

1

**COMPLAINT**

3.     In the alternative, Desside brings an action for restitution based on unjust enrichment for Megawine's retention of $6.5 million and €4.55 received directly from Desside without repayment.  It would be unjust for Megawine to receive the benefit of the borrowed funds without repayment to Desside.

4.     Pleading in the alternative, Desside brings an action for tortious interference with contractual relations for Megawine's interference with Mozel's performance of the loan agreements through the siphoning of funds to Megawine, leaving Mozel unable and/or unwilling to fulfill its contractual obligations.

5.     In addition, Desside brings an action for fraudulent transfer against Shats and Zastoupailo based on their receipt of shares of Megawine from Tomchin, the guarantor of the loan agreements, for less than reasonably equivalent value.

**PARTIES**

6.     Plaintiff Desside is a corporation organized and existing under laws of the British Virgin Islands.

7.     Defendant Megawine is a California corporation with its headquarters and principal place of business located at 16129 Cohasset Street, Van Nuys, California 91406.

8.     Defendant Shats is a resident of California residing at 4201 Alhama Drive, Woodland Hills, California.

9.     On information and belief, Defendant Zastoupailo is a resident of California residing at 24720 Calvert Street, Woodland Hills, California.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(2).  Plaintiff Desside is a corporation organized and existing under the laws of a foreign state while Defendant Shats is citizen of California, Defendant Zastoupailo is a citizen of California, and Defendant Megawine is incorporated under the laws of California and has its principal place of business in California.

//

2

**COMPLAINT**

11.     The sum in controversy exceeds $75,000 exclusive of interest and costs.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because all defendants reside in this judicial district and 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## BACKGROUND

### Mozel Borrows $16 Million From Desside

13.     Plaintiff hereby incorporates each and every prior paragraph of this Complaint and restates them as if they were fully written herein.

14.     Under a loan agreement dated September 1, 2006, Desside provided Mozel a $4 million line of credit for the financing of working capital (the "2006 Credit Line").   A true and correct copy of the 2006 Credit Line Agreement is attached hereto as Exhibit A.

15.     The 2006 Credit Line had a maturity date of August 31, 2007, with quarterly interest payments due beginning December 31, 2006.

16.     Desside and Mozel reached a subsequent agreement on June 23, 2008, which extended the maturity date of the 2006 Credit Line to June 31, 2010.

17.     Mozel subsequently failed to repay the principal debt, as well as interest, of the 2006 Credit Line.   As of March 9, 2012, Mozel owed Desside $4,572,000 under the 2006 Credit Line.

18.     Desside and Mozel also reached a separate contract, dated July 1, 2008, which extended a line of credit totaling $10 million for financing of working capital (the "2008 Credit Line").   A true and correct copy of the 2008 Credit Line Agreement is attached hereto as Exhibit B.

19.     The 2008 Credit Line had a maturity date of June 31, 2010, with quarterly interest payments due beginning October 31, 2008.

//

//

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

3

**COMPLAINT**

20.     Mozel subsequently failed to repay the principal debt, as well as interest, of the 2008 Credit Line.  As of March 9, 2012, Mozel owed Desside $11,428,000 under the 2008 Credit Line.

21.     Thus, as of March 9, 2012, the debt under the 2006 Credit Line and the 2008 Credit Line (collectively, the "Dollar Credit Lines") totaled approximately $16 million.

22.     By agreement dated November 12, 2012, Desside and Mozel converted Mozel's total debt to Desside arising from the Dollar Credit Lines into a loan obligation of $16 million (the "2012 Loan").  A true and correct copy of the 2012 Loan Agreement is attached hereto as Exhibit C.

23.     Tomchin, the Chief Executive Officer and principal beneficiary owner of Mozel, executed the 2012 Loan Agreement in the presence of Desside's Russian attorney Natalia Pokazanova ("Pokazanova") after she verified his identity and authority to enter into the agreement on behalf of Mozel.  Tomchin affixed Mozel's corporate seal to the 2012 Loan Agreement.

24.     The terms of the 2012 Loan stated that Desside will provide Mozel with a non-revolving line of credit in the amount of $16 million for the financing of working capital at 8% interest per annum.  The 2012 Loan included three maturity dates: (1) $1,500,000 by December 31, 2013; (2) $7,500,000 by December 31, 2014; and (3) $7,000,000 by December 31, 2015. Ex. C, p. 4.

25.     The 2012 Loan required quarterly interest payments beginning on April 30, 2012.

**Mozel Borrows €9.2 Million from Desside**

26.     Under a loan agreement dated December 7, 2010, Desside provided Mozel a €2 million line of credit for the financing of working capital (the "2010 Credit Line").  A true and correct copy of the 2010 Credit Line is attached hereto as Exhibit D.

BuckleySandler LLP
100 Wilshire Blvd., Suite 1000
Santa Monica, CA 90401

4

**COMPLAINT**

27.   The 2010 Credit Line had a maturity date of June 30, 2014, with quarterly interest payments due beginning April 30, 2011.

28.   As of December 11, 2012, the outstanding principal balance on the 2010 Credit Line was €2 million, as Desside had provided the full amount of the credit to Mozel, but Mozel had not yet made any principal payments.

29.   Desside and Mozel reached a separate contract, dated February 12, 2011, which extended a line of credit totaling €4.5 million for the financing of working capital (the "February 12, 2011 Credit Line"). A true and correct copy of the February 12, 2011 Credit Line is attached hereto as Exhibit E.

30.   The February 12, 2011 Credit Line had a maturity date of July 30, 2012, with quarterly interest payments due beginning April 30, 2011.

31.   Mozel subsequently failed to repay the principal debt on the February 12, 2011 Credit Line.  As of December 11, 2012, the outstanding principal balance remained €4.5 million.

32.   Desside and Mozel reached a third Euro contract, dated February 14, 2011, which extended a line of credit totaling €2.7 million for the financing of working capital (the "February 14, 2011 Credit Line"). A true and correct copy of the February 14, 2011 Credit Line is attached hereto as Exhibit F.

33.   The February 14, 2011 Credit Line had a maturity date of July 30, 2013, with quarterly interest payments due beginning April 30, 2011.

34.   As of December 11, 2012, the outstanding principal balance of the February 14, 2011 Credit Line remained €2.7 million.

35.   Thus, as of December 11, 2012, the debt under the 2010 Credit Line, the February 12, 2011 Credit Line, and the February 14, 2011 Credit Line (collectively, the "Euro Credit Lines") totaled €9.2 million.

36.   Similar to the Dollar Credit Lines, Desside and Mozel entered into an agreement dated January 24, 2013 to convert Mozel's total debt to Desside arising

BUCKLEY SANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

**COMPLAINT**

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

from the Euro Credit Lines into a loan obligation for €9.2 million (the "2013 Loan"). A true and correct copy of the 2013 Loan is attached hereto as Exhibit G.

37.     The terms of the 2013 Loan stated that Desside will provide Mozel with a non-revolving line of credit in the amount of €9.2 million for the financing of working capital at 8% interest per annum.  The 2013 Loan included two maturity dates: (1) €2,700,000 by December 31, 2012; and (2) €6,500,000 by December 31, 2013.  *Id.*, p. 4.

38.     The 2013 Loan required quarterly interest payments beginning on April 30, 2012.

**Tomchin Personally Guarantees the €9.2 Million Loan**

39.     On March 1, 2013, Tomchin entered into a personal Guarantee with Desside, in which he personally guaranteed Mozel's obligations under the 2013 Loan should Mozel fail to repay the debt.  A true and correct copy of the Guarantee is attached hereto as Exhibit H.

40.     Tomchin's spouse, Natalia Lukina, also joined in the Guarantee, accepting that Desside's rights against Tomchin took priority over any rights she may have against Tomchin or his assets.

41.     Tomchin acknowledged the execution of the Guarantee in California before a California notary public.

**Mozel Directs the Payment of $6.5 Million and €4.55 Million of the Loaned Funds Directly to Megawine**

42.     From 2006 to 2011, Mozel made dozens of draws on the Dollar and Euro Credit Lines, including through written draw requests that the funds be deposited directly with a particular entity identified by Mozel.

43.     The draw requests by Mozel to Desside pursuant to the Dollar Credit Lines and the Euro Credit Lines are attached as Exhibit I.

44.     The swift messages confirming the wiring of funds by Desside pursuant to Mozel's draw requests are attached as Exhibit J.

**COMPLAINT**

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

45.   The reconciliation statements attached and incorporated into the 2012 and 2013 Loan Agreements also confirm the writing of funds by Desside pursuant to Mozel's draw requests.  Ex. C, pp. 119-20; Ex. G, pp. 69-71.

46.   Megawine was one of the entities to whom Desside made payments as a result of Mozel's draw requests. Mozel made twenty-one requests to Desside for payments to Megawine and the resulting payments honoring such requests equaled $6.5 million from the Dollar Credit Lines and €4.55 million from the Euro Credit Lines.

47.   All payments from the Dollar Credit Lines were made to a Megawine account with First Commerce Bank.

48.   All payments from the Euro Credit Lines were made to a Megawine account with City National Bank.  Bank account statements confirming the receipt of the funds are attached as Exhibit K.

**Mozel Defaults on the 2012 and 2013 Loan Agreements**

49.   Mozel defaulted on its obligations to Desside by failing to timely make the required interest payments under the 2012 and 2013 Loans.

50.   Pursuant to the 2012 and 2013 Loan agreements, and in accordance with applicable law, Desside accelerated the maturity date, and, upon Mozel's failure to respond to a proper demand for payment, initiated legal proceedings against Mozel.

51.   In July 2013, Desside initiated a collection action Mozel in the Arbitration Court of St. Petersburg (the "Russian Tribunal") to recover almost $30 million in defaulted loans (the "Russian Legal Proceeding").

52.   In the Russian Legal Proceedings, Mozel denied receiving, whether directly or indirectly, any of the loaned funds.

53.   The Russian Tribunal received and considered evidence obtained in a discovery proceeding initiated pursuant to 28 U.S.C. § 1782 in this district, Case No. 13-cv-8211-JAK-JCG (the "Related Case").

**COMPLAINT**

54.     On January 23, 2014, the Russian Tribunal ruled in favor of Desside, holding that Mozel breached the 2012 and 2013 Loan Agreements.

55.     The Russian Tribunal rejected Mozel's defenses, including its denial that it received any funds from Desside and its argument that the 2012 and 2013 Loan Agreements and draw requests were not concluded and/or were forgeries.

56.     In entering judgment in Desside's favor, the Russian Tribunal found Mozel liable for approximately $31 million, €17 million, and 400 thousand Rubles.

57.     Mozel filed an appeal on March 3, 2014. The appeal is pending in the Thirteenth Commercial Court of Appeal.

58.     Desside has been unable to collect on Mozel's debt due to Mozel's appeal in the Russian Legal Proceeding.

59.     Based on information and belief, Mozel has used its delay of the Russian Legal Proceeding to transfer and conceal assets, including the transfer of assets to Megawine, leaving Mozel undercapitalized.

**Tomchin and His Family Own Both Mozel and Megawine**

60.     Tomchin is the CEO and principal owner of Mozel.

61.     Tomchin and his family also own Megawine.

62.     In 2002, Tomchin created Megawine for the benefit of Mozel.

63.     Mozel originally owned 650 of 1000 shares of Megawine with Tomchin owning the remaining 350 shares.

64.     A true and correct copy of Megawine's share ledger is attached as Exhibit L.

65.     In 2006, only a month after signing the first loan agreement with Desside, Mozel transferred 150 shares of Megawine to Tomchin and 500 shares of Megawine to Shats, Tomchin's cousin.

**Tomchin Controlled Mozel and Megawine**

66.     In addition to being the principal beneficial owner of both Mozel and Megawine, Tomchin is also an officer of both Mozel and Megawine.

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

**COMPLAINT**

67.   Tomchin is CEO of Mozel and Director, Chief Financial Officer, and head of the export division of Megawine.

68.   A true and correct copy of the Arizona Corporate Annual Report & Certificate of Disclosure listing Tomchin as Treasurer and Director is attached as Exhibit M.

69.   A true and correct copy of the California Statement of Information filed September 16, 2013, listing Tomchin as Chief Financial Officer and Director, is attached as Exhibit N.

70.   A true and correct copy of the California Department of Alcoholic Beverage Control License Query System Summary listing Tomchin as Treasurer is attached as Exhibit O.

71.   While Shats was made the nominal president of Megawine, the actual control of Megawine's operations remained with Tomchin.

72.   For example, Tomchin directed how Megawine distributed the funds received from Desside.

73.   In a February 26, 2011 email from Tomchin to Shats, Tomchin instructs, "Dessides should have sent €750,000 this Friday.  About €16,000 are left on the account.  Can you pay on Monday?" and then goes on to list the specific amounts to be paid to each supplier, "€250,000 to Gandia," "€290,000 to Euroexport (especially urgent)," "€125,000 to Zimmerman," "€75,000 to Emons," "24,392.93 to Les Grands Chais… ." Exhibit P.

74.   In another email, dated Monday March 14, 2011, Tomchin states, "On Friday €550,000 should have come from Dessides.  The euro distribution is as follows" and includes a table directing payments to suppliers.  Exhibit Q.

75.   Tomchin's centrality is demonstrated by the disproportionately large salary he drew from Megawine.  In 2010, Tomchin earned $371,200 while Shats, Megawine's nominal president, earned only $92,550.  In 2011, Tomchin earned

BUCKLEY SANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

$506,601 to Shats' $102,000 and in 2012, Tomchin earned $286,717 while Shats earned $102,500.

76.  A true and correct copy of Megawine's salary ledger is attached as Exhibit R.

77.  The difference between Tomchin's responsibilities at Mozel and Megawine was not written anywhere.

78.  So intermingled were Tomchin's roles at Megawine and Mozel that even Shats, Megawine's nominal president, could not identify a difference and admitted that Tomchin played his roles at both companies concurrently. Exhibit S (Shats Tr. 397:14-23).

## Mozel Uses Megawine as Mere Straw Company for Mozel's Business

79.  Tomchin created Megawine for the benefit of Mozel to stand as a shell company between Mozel and its suppliers. Exhibit S (Shats Tr. 162:20-23).

80.  He did so in a series of "triangular transactions." In the "triangular transactions," Mozel would place an order with a supplier for wine or spirits, the supplier would bill Megawine, and the supplier would ship the product directly to Mozel in Russia. Megawine would then bill Mozel. Exhibit S (Shats Tr. 79:24-82:2, 264:9-19, 265:15-267:6).

81.  One of the purposes of this triangular structure is to evade Russian law. Under Russian law, Mozel is required to register with the government each contract with each supplier. Exhibit S (Shats Tr. 88:4-90:3).

82.  By having Megawine stand in the shoes of its real suppliers, Mozel eases the administrative burden of registering its contracts and permits Mozel to evade compliance with Russian law.

## Mozel and Megawine Commingled Funds

83.  Tomchin commingled the funds of Mozel and Megawine.

//

//

BuckleySandler LLP
100 Wilshire Blvd., Suite 1000
Santa Monica, CA 90401

COMPLAINT

84.     As an owner and officer of both Mozel and Megawine, Tomchin stood on both sides of their contractual arrangement with no differentiation between his role in Mozel and Megawine. Exhibit S (Shats Tr. 397:14-23).

85.     Tomchin stood on both sides of this contractual arrangement, as the CEO of Mozel and the head of the international export division of Megawine.

86.     For each triangular transaction, Tomchin directed the drafting of invoices from Megawine to Mozel to include substantial markups even though Megawine did nothing to earn the markup.

87.     Tomchin used the invoices to commingle the funds of Megawine and Mozel and the markups to drain Mozel of its assets and increase Megawine's profit margin. Exhibit S (Shats Tr. 85:10-86:20, 265:15-267:6).

88.     The effect was to drain Mozel of funds and park them with Megawine.

89.     For example Haus (a supplier to Mozel) charged Megawine 28,139.86 Euros for a shipment and Megawine then charged Mozel 43,491 Euros for the very same product. A 54% markup. Exhibit T.

90.     Similarly, on another occasion, Haus charged Megawine 26,909 Euros while Tomchin drafted an invoice from Megawine to Mozel for 41,040 Euros for the very same product. A 34% markup. Exhibit U.

91.     Tomchin also directed the depositing of funds borrowed by Mozel from Desside directly into Megawine's accounts.

92.     The deposit of $6.5 million and €4.55 million borrowed by Mozel from Desside directly to Megawine represents a commingling of assets of Megawine and Mozel.

93.     Conversely, Tomchin transferred funds from Megawine to Mozel through "marketing allowance" payments by Megawine to Mozel at the end of each calendar year.

94.     Megawine's Quickbooks ledger contains the following "marketing allowance" invoices from Mozel: $2,770,734.40 for 2005; $9,443,455 for December

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

11

**COMPLAINT**

30, 2006; $15,283,579 for December 31, 2007; $16,648,851 for December 31, 2008; two invoices totaling $8,927,202.13 for December 31, 2009; $14,202,829.91 for December 31, 2010; $15,675,018.32 for December 31, 2011; and $13,775,330.87 for December 31, 2012. Exhibit V.

95.   Tomchin determined the amount of marketing allowance in his sole discretion.

96.   Mozel never actually marketed any products of Megawine as Megawine had no products to market because it was serving only as a conduit between Mozel and its suppliers.

97.   Nor is there documentation to show that Mozel actually spent funds on marketing. Exhibit S (Shats Tr. 412:2-8).

98.   The "marketing allowances" were not for any legitimate business purpose, but solely to facilitate shifts of funds, presumably for the purposes of evading taxes and creditors, between Mozel, in Russia, and Megawine, in the United States.

**Mozel Uses Megawine to Defraud Desside**

99.   Tomchin used the inflated invoices and phony "marketing allowances" as devices to "roundtrip" funds from Mozel to Megawine and back to Mozel.

100.   By conducting these "roundtrip transactions," Tomchin used Mozel and Megawine to obscure profits as supposed expenses.

101.   Tomchin then directed the funds to offshore accounts to shield the funds from his and Mozel's creditors.

102.   The purpose of these apparent "roundtrip transactions" was thus to siphon off the funds borrowed by Mozel from Desside to Tomchin's personal benefit and the benefit of his cronies and family such as Shats and Zastoupailo.

103.   An additional effect may have been to artificially reduce taxable income to evade tax liability for Megawine in the United States and for Mozel in Russia.

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

**COMPLAINT**

104. In the alternative, the "marketing allowances" are false book entries and the funds remained in the United States under the control of Megawine, Tomchin, or Shats.

**Tomchin's Fraudulent Transfer of his Shares of Megawine**

105. In response to incurring debt to Desside, Tomchin attempted to conceal his ownership of Megawine by transferring shares of Megawine to his cousin and stepson.

106. On April 4, 2013, one month after signing the Personal Guarantee, Tomchin transferred 80 shares of Megawine to his wife's son, Zastoupailo.

107. On information and belief, Zastoupailo did not pay for the shares.

108. On November 1, 2013, while the collection action was pending against Mozel in Russia, Tomchin sold 420 shares of Megawine to Shats for only $21,000.

109. In comparison, when Shats purchased 500 shares from Mozel in October 2006, he paid $900,000.

110. According to Megawine's tax returns, Megawine earned more than $27 million in revenue in 2011 and had over $4.5 million in profit while back in 2007 Megawine earned approximately $21 million in revenue and approximately $2.5 million in profit. Exhibit W.

**Tomchin's Fraudulent Use of CAT Consulting and Trading AG As Part of the Megawine/Mozel Scheme Against Desside**

111. Tomchin also used CAT Consulting and Trading AG ("CAT-Consulting") to commingle the funds of Mozel and Megawine.

112. Under the triangular transactions, Megawine was obligated to pay for the transportation cost of the liquor. Exhibit S (Shats Tr. 361:23-362:4).

113. Megawine's invoices to Mozel state "Terms of delivery: CPT St. Petersburg," meaning that the price includes the shipping costs. Exhibit T (Shats Tr. 405:21-406:4).

//

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

**COMPLAINT**

114.   Megawine's invoices to Mozel enclose the underlying transportation company's invoices showing the amount Megawine paid for transportation. Exhibits T, U (invoices).

115.   Notably, a substantial number of the underlying transportation invoices bill CAT Consulting and Trading AG rather than Megawine. *See for example* Exhibits T, U (invoices). CAT Consulting appears to be an intermediary company that Mozel used to arrange for shipping of liquor ordered in the Triangular Transactions to Mozel in Russia.

116.   These facts demonstrate further that Megawine and Mozel operated as one enterprise, repeatedly disregarding Megawine's purported corporate separateness from Mozel.  To wit:

117.   Megawine had the contractual obligation to pay for shipping of the liquor to Mozel, yet Mozel repeatedly paid shipping costs. Mozel made these payments to CAT-Consulting using funds loaned to it by Desside.

118.   Such use of the credit lines made available to Mozel by Desside, constituted a separate and independent breach of the loan agreements with Desside. The loans were for the purposes of financing Mozel's working capital, not Megawine's.

119.   The use of Desside's loans to finance Megawine's working capital again demonstrates that Mozel treated Megawine, and Megawine treated Mozel, as one consolidated enterprise.

120.   Further, on information and belief, CAT-Consulting itself was an active participant with Mozel and Megawine in the underlying scheme to defraud Desside. In effect, most triangular transactions between a liquor supplier, Megawine and Mozel, involved second triangular transactions between the shipping company used to transport the liquor to Russia, Megawine and Mozel.  The second triangular transaction for shipping costs worked in much the same way as the one involving the purchase and sale of the liquor itself. That is, Mozel, through CAT-Consulting,

BUCKLEY SANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

14

**COMPLAINT**

would place an order for transportation services, but Megawine would be contractually obligated to pay for the services.   Megawine would include the shipping costs on its inflated invoices to Mozel.  These inflated charges were then paid using Desside's funds.

121.   In addition, at times, Mozel would also pay CAT-Consulting directly for supposed shipping costs.  It would do so through draw requests to Desside for payments to CAT-Consulting.  Mozel made twenty-two draw requests to Desside for payments to CAT Consulting and Trading AG and the resulting payments honoring such requests equaled $2.25 million and €1.05 million.

122.   On information and belief, the separate payments constituted one of the mechanisms for siphoning off Desside's money into other entities controlled by Tomchin and his cronies at the expense and loss of Desside.  On information and belief, these payments constituted "double-payments" of shipping expenses previously paid by Megawine.  This way, Desside's money could be siphoned off at twice the rate

123.   Mozel made similar draw requests to Desside for payment to the following additional entities: EINIG-ZENZEN GmbH & Co. KG, and CASA VINICOLA CALDIROLA S.P.A.

**Megawine Manipulates Evidence of its Relationship with Mozel and Tomchin in Response to a Demand for Preservation of Evidence**

124.   On November 27, 2013, Desside filed a petition ("Petition") with this Court pursuant to 12 U.S.C. § 1782 seeking discovery from Megawine in support of the Russian Legal Proceeding against Mozel.  *See* Related Case, Dkt. No. 9.

125.   On November 20, 2013, in anticipation of discovery, Desside served Megawine with a demand to preserve evidence of Tomchin's personal involvement with the operations of Megawine and all documents relating to Megawine's ownership and management structure. Exhibit X.

//

15

**COMPLAINT**

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

126.   Rather than preserve this information, Megawine set out immediately to fabricate evidence that Tomchin and Lukina had no involvement at all with Megawine.

127.   The very next morning after receiving the Preservation Letter, Megawine faxed a revised Statement of Information to the California Secretary of State removing any reference to Tomchin, and replacing him with Boris Shats. Exhibit N.

128.   This filing occurred only two months after Megawine had filed a Statement of Information confirming that Tomchin was its Chief Financial Officer.

129.   Evidence produced by one of the subpoenaed banks, Grandpoint, reveals that Megawine also immediately altered its Corporate Authorization Resolution to remove any reference to Tomchin.  Exhibit Y.

130.   Moreover, the deception was extended to Megawine's corporate website.  Up until the moment of Desside's preservation letter, Megawine's website listed Natalia Lukina, Tomchin's wife, as its point of contact for the company's "Export" Department.  Shortly thereafter, Megawine altered its website to remove the reference to Lukina. Exhibit Z.

## FIRST CAUSE OF ACTION

### (Breach of Contract based on Alter Ego)

131.   Plaintiff hereby incorporates each and every prior paragraph of this Complaint and restates them as if they were fully written herein.

132.   The 2012 Loan and the 2013 Loan are valid contractual obligations of Mozel.

133.   Desside fully performed under the contracts by providing Mozel with $16 million and €9.2 million.

134.   Mozel is in breach of its contractual obligations by failing to repay the loans.

BUCKLEY SANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

135.   As a result of Mozel's default, Desside has been harmed by not receiving the $16 million and €9.2 million plus interest it its owed under the loan agreements.

136.   Unity of interest and ownership exists between Megawine and Mozel.

137.   At all relevant times, Tomchin was the principal officer and shareholder of both entities and controlled the conduct of both entities.

138.   Based on information and belief, Tomchin continues to control Megawine through Shats and Zastoupailo.

139.   Tomchin commingled the funds of Megawine and Mozel through inflated invoices and unsubstantiated exorbitant marketing allowances, not paid in the ordinary course of business.

140.   Mozel's use of the funds borrowed from Desside to pay Megawine's transportation expenses obligations to CAT Consulting and Trading AG further constitutes commingling of funds and establishes that the Tomchin treated Mozel and Megawine as one enterprise.

141.   Megawine was the direct recipient of $6.5 million and €4.55 million directly from Desside pursuant to Mozel's draw requests.

142.   Under the Megawine-Mozel-Distiller triangular transaction, Megawine existed for the benefit of Mozel, including as a conduit for contracting with Mozel's suppliers.

143.   Tomchin used Megawine as a single enterprise with Mozel to roundtrip funds in order to siphon off the funds borrowed by Mozel from Desside.  Tomchin used the roundtrip transaction to divert the funds through purported expenses and leave Mozel undercapitalized.

144.   Megawine's past efforts at manipulating evidence to hide Tomchin's and Mozel's true relationship to Megawine demonstrate that Megawine's corporate formalities are nothing more than a method to attempt to conceal the true relationship between the parties.

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

145.   Megawine was aware of Mozel's loan agreement with Desside.

146.   Failure to disregard the separate corporate entities would result in an inequitable and unjust result of Desside not being repaid for the loans it provided Mozel and by extension and direct receipt, Megawine.

147.   Thus, Megawine is the alter ego of Mozel.

148.   Accordingly, Megawine is jointly and severally liable to Desside under the defaulted loan agreements.

**SECOND CAUSE OF ACTION**

**(Restitution Based on Quasi-Contract/Unjust Enrichment under State Common Law)**

149.   Plaintiff hereby incorporates by reference paragraphs 1-130 of the Complaint and restates them as if they were fully written herein.  Plaintiff pleads this Count in the alternative if the corporate separateness of Mozel and Megawine are recognized.

150.   Megawine has received $6.5 million and €4.55 million from Desside without repayment.

151.   Megawine has given nothing of value to Desside in return.

152.   Therefore, Megawine has been unjustly enriched, creating a quasi-contractual obligation to restore these ill-gotten gains to Plaintiff.

153.   As a legal and equitable result of Megawine's unjust enrichment, Plaintiff is entitled to restitution.

**THIRD CAUSE OF ACTION**

**(Tortious Interference)**

154.   Plaintiff hereby incorporates by reference paragraphs 1-130 and 149-153 of the Complaint and restates them as if they were fully written herein.  Plaintiff pleads this Count in the alternative if the corporate separateness of Mozel and Megawine are recognized.

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

155.   The loan agreements between Desside and Mozel are valid contractual obligations.

156.   Megawine was aware of the loan agreements between Desside and Mozel.

157.   Megawine disrupted and interfered with the contractual relationship between Mozel and Desside and rendered Mozel unable or unwilling to perform its contractual obligations by (a) issuing inflated invoices to Mozel to drain Mozel of the borrowed funds; (b) having Mozel pay Megawine's transportation expenses obligations using the Dollar and Euro Credit Lines supplied by Desside; and (c) the receipt of $6.5 million and €4.55 directly from Desside.

158.   As a result of Megawine's actions, Mozel has defaulted under the loan agreements.

159.   As a result of Mozel's default, Desside has been harmed by not receiving the $16 million and €9.2 million plus interest it its owed under the loan agreements.

160.   Megawine is liable to Desside for the harm caused by it tortious interference with Desside's contractual relationship with Mozel.

**FOURTH CAUSE OF ACTION**

**(Fraudulent Conveyance – Against Shats and Zastoupailo)**

161.   Plaintiff hereby incorporates each and every prior paragraph of this Complaint and restates them as if they were fully written herein.

162.   On March 1, 2013, Tomchin incurred his obligation under the personal Guarantee.

163.   On April 4, 2013, Tomchin transferred 80 shares of Megawine to his wife's son, Zastoupailo without receiving payment in return.

164.   Zastoupailo received the 80 shares of Megawine without paying reasonably equivalent value.

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

BUCKLEYSANDLER LLP
100 WILSHIRE BLVD., SUITE 1000
SANTA MONICA, CA 90401

165.   On November 1, 2013, Tomchin transferred 420 shares of Megawine to his cousin Shats for only $21,000.

166.   In comparison, when Shats purchased 500 shares from Mozel in October 2006, he paid $900,000

167.   In 2011, Megawine earned more than $27 million in revenue and over $4.5 million in profit while in 2007 Megawine earned approximately $21 million in revenue and approximately $2.5 million in profit.

168.   Shat's payment for the shares does not constitute reasonably equivalent value.

169.   Tomchin transferred the shares with actual intent to hinder, delay, or defraud Desside.

170.   Tomchin was either insolvent at the time of the transfer or became insolvent as a result of the transfer.

171.   Tomchin was engaged or was about to engage in a business or a transaction for which his remaining assets of the debtor were unreasonably small in relation to the business or transaction.

172.   Tomchin intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his or her ability to pay as they became due.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests judgment for relief as follows:

A.   Judgment in the amount of $16 million and €9.2 million plus interest.

B.   In the alternative, restitution in the amount of $6.5 million and €4.55 million.

C.   Voidance of the transfer of 500 shares of Megawine from Tomchin to Shats and Zastoupailo and the placement of said shares under receivership.

//

//

**COMPLAINT**

Dated: April 1, 2014

**BUCKLEYSANDLER LLP**

By: _____
Fredrick S. Levin

Richard E. Gottlieb (SBN 289370)
Fredrick S. Levin (SBN 187603)
100 Wilshire Boulevard, Suite 1000
Santa Monica, CA 90401
Phone: (310) 424-3900
Facsimile: (310) 424-3960
*Attorneys for Plaintiff Desside Holdings Limited*

1513852

21

**COMPLAINT**